**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LEON A.** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 20-cv-939** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey I. Cummings** |
| | ) | |
| **KILOLO KIJAKAZI,** | ) | |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Leon A. ("Claimant") moves to reverse the final decision of the Commissioner of Social

Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIBs").  (Dckt.

#17).  The Commissioner brings a cross-motion for summary judgment seeking to uphold its

decision to deny benefits.  (Dckt. #19).  The parties have consented to the jurisdiction of a United

States Magistrate Judge pursuant to 28 U.S.C. §636(c).  This Court has jurisdiction to hear this

matter pursuant to 42 U.S.C. §405(g).  For the reasons that follow, Claimant's request for

reversal is denied and the Commissioner's motion for summary judgment is granted.

**I.      BACKGROUND**

**A.      Procedural History**

On October 19, 2016, Claimant (then fifty-three years old) filed an application for DIBs,

alleging disability dating back to October 22, 2015, due to anxiety, depression, and "explosive

anger."  (R. 177-79).  His claim was denied initially and upon reconsideration.  (R. 13).

---

[1] In accordance with Internal Operating Procedure 22 - Privacy in Social Security Opinions, the Court refers to plaintiff only by his first name and the first initial of his last name.  Acting Commissioner of Social Security Kilolo Kijakazi has also been substituted as the named defendant.  Fed.R.Civ.P. 25(d).

Claimant filed a timely request for a hearing, which was held on August 15, 2018, before Administrative Law Judge ("ALJ") Diane S. Davis. (R. 31-75). On December 12, 2018, the ALJ issued a written decision denying Claimant's application for benefits. (R. 10-30). The Appeals Council denied review on December 11, 2019, leaving the decision of the ALJ as the final decision of the Commissioner. (R. 1-6). This action followed.

### B.    The Social Security Administration Standard to Recover Benefits

To qualify for disability benefits, a claimant must demonstrate that he is disabled, meaning he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. §404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. 20 C.F.R. §404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. §404.1520(a)(4)(i). At step two, the ALJ determines whether a claimant has one or more medically determinable physical or mental impairments. 20 C.F.R. §404.1521. An impairment "must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." *Id.* In other words, a physical or mental impairment "must be established by objective medical evidence from an acceptable medical source." *Id.*; *Shirley R. v. Saul*, 1:18-cv-00429-JVB, 2019 WL 5418118, at *2 (N.D.Ind. Oct. 22, 2019). If a claimant establishes that he has one or more physical or mental impairments,

the ALJ then determines whether the impairment(s) standing alone, or in combination, are severe and meet the twelve-month duration requirement noted above. 20 C.F.R. §404.1520(a)(4)(ii).

At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the listings"). The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, the individual is considered disabled, and no further analysis is required. If the listing is not met, the analysis proceeds. 20 C.F.R. §404.1520(a)(4)(iii).

Before turning to the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), or his capacity to work in light of the identified impairments. Then, at step four, the SSA determines whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. §404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id.* If the claimant cannot undertake his past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform given his RFC, age, education, and work experience. If such jobs exist, an individual is not disabled. 20 C.F.R. §404.1520(a)(4)(v).

## C. The Evidence Presented to the ALJ

Claimant seeks DIBs due to limitations from depression, anxiety, and "explosive anger that posed a danger to himself and others." The administrative record contains the following evidence that bears on his claim:

### 1. Evidence from Claimant's Treating Psychiatrists

Marta E. Banegas, Psy.D., who treated Claimant from 2008 through 2016, (R. 389-410), completed a Mental Impairment Questionnaire on Claimant's behalf on October 22, 2016. (R. 301-03). She opined that Claimant was moderately limited in his ability to: (1) perform activities

within a schedule, maintain regular attendance, and be punctual; (2) sustain an ordinary routine without special supervision; (3) make simple work-related decisions; (4) ask simple questions or request assistance; (5) be aware of normal hazards and take appropriate precautions; and (6) respond appropriately to changes in a routine work setting. (R. 302).

Dr. Banegas further found that Claimant was markedly limited in his ability to: (1) work in coordination with or proximity to others without being unduly distracted by them; (2) complete a normal workday and workweek without interruption and perform at a consistent pace; (3) interact appropriately with the general public; (4) accept instructions and respond appropriately to criticism from supervisors; and (5) travel in unfamiliar places or use public transportation set realistic goals or make plans independent of others. (R. 302). She also found that Claimant had no restriction in activities of daily living, a moderate restriction in maintaining social functioning, a moderate deficiency in concentration, persistence, and pace, and had experienced repeated episodes of decompensation. (R. 303). She concluded that Claimant would typically be off-task for at least 21% of the workday, that he would be absent about once a month due to his impairments, and that his behaviors "place[d] others at risk." (R. 301-03).

Claimant began receiving mental health treatment at Riveredge Hospital in 2017 with different providers. (R. 375). During his initial evaluation on October 13, 2017, he was diagnosed with severe major depressive disorder and generalized anxiety disorder. (R. 346). He routinely reported anxiety, depressive symptoms, mood liability, impulsivity, and aggression. (R. 351, 354, 361, 378, 381). In March 2018, treatment records indicated that Claimant's anxiety was mild and his mood was "ok but still anxious." (R. 341). His doctor prescribed Zoloft and, at his next appointment on May 8, 2018, Claimant reported that his mood was "good, a lot better." (R. 340). Claimant typically presented with cooperative behavior, good insight, fair judgment,

4

fair impulse control, appropriate affect, intact attention and concentration, and a goal-directed thought process. However, he had an "irritable" mood in July 2018 and reported continued instances of irrational anger. (R. 339). His treatment provider prescribed a trial period of Trileptal to address the ongoing symptoms. (*Id.*). As of his hearing date, Claimant was prescribed Trileptal, Xanax, Wellbutrin, Zoloft, and Seroquel. (R. 48).

### 2. Evidence from the Consulting Psychiatrist

On January 23, 2017, Claimant met with Lauren Oganovich, Psy.D., a consultative psychologist for the state. Claimant informed Dr. Oganovich that his medications "seem[ed] to be effective at addressing" his symptoms. (R. 305). He also reported that he: had an anxiety attack every morning, did not like to drive more than five miles because his "anger set in," no longer enjoyed reading because he was "too anxious," and had no friends. (R. 306). Dr. Oganovich observed that Claimant's thought processes were logical, his speech was coherent, his stream of conversation was relevant, his abstract thinking abilities were functional, and his social judgment was asocial. (R. 306-07). He was polite, cooperative, and responsive. (*Id.*). Claimant was oriented as to person, place, and time, but his immediate memory presented as impaired (he could repeat five digits in order, but only three in reverse). (R. 306). Claimant was unable to subtract continuous sevens from one hundred, but he could multiply and add single digits. Dr. Oganovich found that he "should be responsible for the management of his own funds." (R. 307). She diagnosed Claimant with major depressive disorder (moderate, recurrent), generalized anxiety disorder, panic disorder, and intermittent explosive disorder. (*Id.*).

### 3. Evidence from State Agency Psychiatrists

State agency consultant Steven Fritz, Psy.D., reviewed Claimant's file on February 12,

2017.  According to Dr. Fritz, Claimant was not significantly limited in his ability to: (1) carry out short and simple instructions; (2) maintain attention and concentration for extended periods; (3) perform activities within a schedule, maintain regular attendance, and be punctual; (4) sustain an ordinary routine without special supervision; (5) make simple work-related decisions; (6) get along with coworkers or peers; and (7) ask simple questions, request assistance, or maintain socially appropriate behavior.  (R. 83-84)  He found Claimant to be moderately limited in his ability to: (1) carry out detailed instructions; (2) work in coordination with or in proximity to others without being distracted by them; (3) interact appropriately with the public; and (4) accept instructions and respond appropriately to criticism from supervisors.  (*Id.*).

Dr. Fritz concluded that Claimant had "the cognitive capacity to perform and sustain semi-skilled, three to four-step tasks" and could perform work activities for the usual periods, at an acceptable pace, and on a regular basis.  (R. 84)  Dr. Fritz further opined that Claimant "would do best in a socially undemanding and restricted setting that require[d] reduced interpersonal contact, away from the public," but "could relate acceptably with a supervisor and coworkers to the minimally necessary degree."  (*Id.*).  Tyrone Hollerauer, Psy.D., reviewed Claimant's file on June 1, 2017, and agreed with Dr. Fritz's findings.  (R. 97-99).

### 4.  Hearing Testimony

At the August 15, 2018 hearing, Claimant testified about the effects of his impairments. According to Claimant, he had worked for nearly twenty-five years in sales, primarily selling bearings, power transmission equipment, and other machine parts.  (R. 41-42)  The work involved taking phone calls, pricing items, sourcing items, and helping customers.  (R. 41)  He was terminated from his most recent position in 2015 after a verbal altercation with his boss.  (R.

42).  Claimant had been terminated from a previous position for refusing to attend a performance review.  (R. 46).

Claimant testified that his mental health symptoms had increased in severity since the deaths of his parents, who passed away before he lost his job in 2015.  (R. 42-43, 47).  He reported that it does not take much to "set him off."  (R. 47).  For example, if someone looks at him as he is walking down the street or cuts him in line, he often becomes verbally aggressive. (R. 50).  He takes five medications, all of which cause drowsiness.  (R. 47).  Claimant had recently started a new medication, but still found himself becoming irrationally angry.  (R. 48). Claimant feels "a sense of calmness and security" around his family.  (R. 52).  Although Claimant used to drive regularly, he now limits himself to five miles per day because he is afraid of getting into confrontations with other drivers.  (R. 61).

Claimant lives with his sister, brother-in-law, and niece.  (R. 52).  He does not do any chores around the house except put his clothes away.  (R. 56).  He makes simple meals such as scrambled eggs.  (*Id.*).  Claimant has six adult children and spends his time going to the gym, watching television, and going on walks.  (R. 59).  He finds it difficult to read because his "mind is constantly racing."  (R. 60).

### D.    The ALJ's Decision

The ALJ applied the five-step inquiry required by the Act in reaching her decision to deny Claimant's request for benefits.  At step one, the ALJ found that Claimant had not engaged in substantial gainful activity during the period between his alleged onset date of October 22, 2015, and his date last insured of December 31, 2019.  (R. 15).  At step two, the ALJ determined that Claimant suffered from the severe impairments of major depressive disorder and anxiety disorder.  (R. 16).  At step three, the ALJ concluded that Claimant did not have an impairment or

combination of impairments that met or medically equaled one of the Commissioner's listed impairments, including listing 12.04 ("depressive disorder"), or 12.06 ("anxiety and obsessive-compulsive disorder"). (*Id.*). The ALJ found that Claimant's impairments caused no limitation in understanding, remembering, or applying information; a moderate limitation in interacting with others; a mild limitation in concentrating, persisting, or maintaining pace; and a mild limitation in adapting and managing himself. (R. 16-18). The ALJ also considered the "paragraph C" criteria and found that the evidence did not demonstrate that Claimant had only marginal adjustment or an inability to handle changes in his everyday life. (R. 18).

Before turning to step four, the ALJ determined that, through the date last insured, Claimant had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels with the following non-exertional limitations:

> He can understand, remember, and carry out simple, routine tasks. He can make simple, work-related decisions and adapt to routine work changes, commensurate with work at the unskilled level, involving Specific Vocational Preparation (SVP) levels of 2 or less. He can perform work that involves no tandem job tasks requiring cooperation with others to complete. He can work in proximity to others, tolerating occasional interaction with coworkers and supervisors; and brief, superficial contact with the public.

(*Id.*). Based on these conclusions, the ALJ determined at step four that Claimant was not capable of performing past relevant work as a sales representative. (R. 24). Even so, at step five, the ALJ concluded that a sufficient number of jobs existed in the national economy that Claimant could perform given his RFC, including the representative positions of conveyor feeder, cleaner, and packager. (R. 25). As such, the ALJ found that Claimant was not disabled. (*Id.*).

## II.    STANDARD OF REVIEW

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C.

§405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). "Substantial evidence is not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021), *quoting Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal quotation marks omitted). The Commissioner's decision must also be based on the proper legal criteria and be free from legal error. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts, resolving conflicts, deciding credibility questions, making independent symptom evaluations, or otherwise substituting its judgment for that of the Commissioner. *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413.

## IV.    ANALYSIS

### A.    The ALJ's failure to limit Claimant to one- to two-step tasks was harmless error.

The ALJ did not include a limitation to one to two-step tasks in her formulation of Claimant's RFC. Claimant asserts that this omission constitutes an error because the ALJ

9

specifically noted that Claimant required such a limitation elsewhere in the RFC assessment.

Specifically, the ALJ found that:

> claimant's history of depression and anxiety, length of medication treatment and
> relative brief period of mental health therapy, support that he retains the ability to
> perform *no more than simple tasks involving one or two step instructions* in
> carrying out tasks commensurate with the SVP level of two or less. The claimant's
> activities of daily living also support he is able to follow *simple, one or two step*
> *instructions* such as his ability to maintain independent living, travel in public
> without assistance, drive, read, watch television programs and documentaries.

(R. 22) (emphasis added). The Commissioner responds that a one- to two-step limitation was

unnecessary because no medical professional found that Claimant required it. (Dckt. #20 at 2).

The Commissioner also asserts that the ALJ "misspoke" when writing the above excerpt, so the

finding should not be credited. (*Id.* at 3).

### 1. The ALJ erred by not limiting Claimant to jobs involving only one- to two-step tasks.

In the Social Security context, the phrase "one- to two-step tasks" is a term of art. The

Department of Labor uses the phrase to distinguish GED/Reasoning Development Levels

("RDL"), which categorize jobs based on the complexity of the tasks involved. *Shlattman v.*

*Colvin*, No. 12 C 10422, 2014 WL 185009, at \*7 (N.D.Ill. Jan. 14, 2014). Because an RDL of 1

is defined as the ability to "[a]pply commonsense understanding to carry out simple one- or two-

step instructions," 1991 WL 688702, several courts have concluded that a limitation to one- to

two-step tasks is the same as a limitation to RDL 1 jobs. *Wiszowaty v. Astrue*, 861 F.Supp.2d

924, 947 (N.D.Ind. 2012) (collecting cases); *Shlattman*, 2014 WL 185009, at \*7 ("What little

appellate caselaw exists tends to support that understanding."). Furthermore, this Court has

previously found that limiting a claimant to "simple, routine, repetitive tasks" is insufficient

when a Claimant requires a one- to two-step limitation. *See, e.g., James J. v. Kijakazi*, No. 19-

cv-02903, 2022 WL 558364, at \*7 (N.D.Ill. Feb. 24, 2022). The Court reaches the same

conclusion here.  Accordingly, the ALJ erred by not limiting Claimant to jobs with an RDL of 1 after finding Claimant unable to perform tasks involving more than one- or two-step instructions.

> ### 2.     The ALJ's failure to include a one- to two-step limitation was harmless because the ALJ identified enough jobs that Claimant could perform given his limitations.

The Commissioner argues that any error the ALJ committed by not limiting Claimant to jobs with an RDL of 1 is harmless.  The Court agrees because one of the three jobs proffered by the ALJ in her decision (namely, the position of conveyer feeder) had an RDL of 1.  (R. 25). Nonetheless, Claimant asserts that the conveyer feeder job is insufficient for three reasons.

First, Claimant asserts that the ALJ was required to identify a significant number of jobs in the precise region where he lives.  However, the Seventh Circuit has repeatedly resolved this issue by considering the number of jobs that exist for a position on a nationwide basis.  *See, e.g., Alaura v. Colvin*, 797 F.3d 503, 507 (7th Cir. 2015) ("[I]f there is a significant number of jobs that the applicant for benefits can perform anywhere in the United States he is deemed not disabled."); *Herrmann v. Colvin*, 772 F.3d 1110, 1114 (7th Cir. 2014) ("For if there is a substantial number of such jobs in the nation, the applicant's claim fails, no matter how few there are in his locality or region"); *see also Dorothy B. v. Berryhill*, No. 18 C 50017, 2019 WL 2325998, at *6 (N.D.Ill. May 31, 2019) ("Plaintiff's second argument, that the ALJ cannot solely rely on the national number of jobs available without reference to regional numbers, is also unsupported.").

Second, Claimant argues that the Commissioner has failed to meet its burden of showing that the job of conveyer feeder offers a sufficiently significant occupational base (whether nationally or regionally).  The Court disagrees.  There are 20,402 conveyer feeder jobs nationwide.  (R. 25).  Several circuits have held that jobs which have a similar (or lesser) number

of positions available nationwide offer a sufficient occupational base. *See, e.g., Taskila v. Comm'r Soc. Sec.*, 819 F.3d 902, 905 (6th Cir. 2016) ("Six thousand jobs in the United States fits comfortably within what this court and others have deemed 'significant.'"); *Young v. Astrue*, 519 Fed.Appx. 769, 772 (3d Cir. 2013) (finding 20,000 jobs nationally to be sufficient); *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir.1997) (finding 10,000 jobs nationally to be sufficient). District courts from this Circuit[2] have similarly found jobs which provide thousands of positions nationally to be sufficient. *See, e.g., Dorothy B. v. Berryhill*, No. 18 CV 50017, 2019 WL 2325998, at *7 (N.D.Ill. May 31, 2019) (17,700 national jobs); *Anderson v. Astrue*, No. 08 C 4917, 2009 WL 2366088 (N.D.Ill. July 28, 2009) (10,800 national jobs); *see also Engel*, 2021 WL 4843871, at *10 (23,000 jobs). Given the above authority, this Court likewise finds that the number of conveyer feeder jobs available nationally is a significant occupational base.[3]

Finally, Claimant asserts that the ALJ's error cannot be harmless because the conveyer feeder job has a level-one math requirement[4] and the ALJ did not explicitly find that he could perform this level of math. (Dckt. #23 at 6). Notably, Claimant does not argue that he could not perform jobs requiring level-one math. Instead, he merely asserts that the Commissioner and the

---

[2] Although it appears that the Seventh Circuit has not yet squarely addressed the number of positions available nationwide that would suffice to establish a sufficient occupational base, *see Engel v. Kijakazi*, 20-CV-1206-SCD, 2021 WL 4843871, at *10 (E.D.Wis. Oct. 18, 2021), the Court has intimated that jobs which offer as few as 1,000 positions nationwide can suffice. *See, e.g., Mitchell v. Kijakazi*, No. 20-2897, 2021 WL 3086194, at *3 (7th Cir. July 22, 2021) (citing *Weatherbee v. Astrue*, 649 F.3d 565, 572 (7th Cir. 2011), which "not[ed] that jobs with as few as 1,000 positions nationally are [a] sufficient occupational base").

[3] The fact that these positions stemmed from only one profession is irrelevant. *See, e.g., Falls v. Berryhill*, No. 17 C 2805, 2018 WL 5839955, at *9 (N.D.Ill. Nov. 7, 2018) (finding ALJ's failure to restrict plaintiff to one- to two-step tasks harmless where one of the three jobs identified by the VE had an RDL of 1).

[4] Level-one math proficiency indicates an ability to add and subtract two-digit numbers; multiply and divide 10's and 100's by 2, 3, 4, and 5; perform basic arithmetic using coins and dollars; and perform operations with various units of measurements (such as cups, inches, and pounds). United States Dept. of Labor, Dictionary of Occupational Titles 1011 (4th ed. 1991).

ALJ "failed to explain" why his documented difficulties with math did not prevent him from performing such jobs. (*Id.* at 6-7). The Court finds that the record does not show that Claimant had mathematical limitations sufficient to require such an analysis. The only evidence in the record of Claimant struggling with math is his inability to accurately subtract sequential sevens. (R. 307). Claimant could multiply and add single digits and Dr. Oganovich concluded that he "should be responsible for the management of his own funds." (*Id.*). Claimant and his sister noted that he could count change, pay bills, and use a checkbook. (R. 234, 253, 261). He has extensive experience in sales, where his stated duties included pricing items and maintaining business accounts. (R. 38, 44-45, 213, 224, 385). More generally, state agency psychological consultant Dr. Fritz found that Claimant is of average intellectual functioning. (R. 82).

Furthermore, neither Claimant nor his counsel suggested to the ALJ that Claimant's alleged disability stemmed in any way from limited mathematical abilities. Claimant argues that requiring such a suggestion "turns 20 C.F.R. §404.1546(c) on its head" by imposing a duty on the Claimant to show how the evidence supports a functional restriction. However, as the Commissioner asserts, Claimant failed to meet his burden of proffering evidence that he was unable to perform the requirements of a job with an RDL of 1. *See Karr*, 989 F.3d at 513 ("Remember, too, that [claimant] bears the burden of proving that she is disabled."); *Ray v. Saul*, 861 Fed.Appx. 102, 106 (7th Cir. 2021) (same); *see also Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016) (finding no error in an ALJ's RFC's determination where claimant did "not identify medical evidence that would justify further restrictions").

### B. The ALJ adequately addressed and provided for Claimant's moderate social limitations in her RFC assessment.

The ALJ limited Claimant to work that involves no tandem job tasks requiring cooperation with others to complete, occasional interaction with coworkers and supervisors, and

brief, superficial contact with the public. (R. 18). Claimant argues that the ALJ failed to explain why these limitations are sufficient to account for his "limits in handling instructions and criticism from supervisors." (Dckt. #17 at 8). In particular, Claimant suggests that the RFC is inconsistent with two findings of state agency psychiatrist Dr. Fritz.

### 1. The RFC reflects Dr. Fritz's opinion that Claimant had "moderate" limitations in accepting instructions and handling criticism.

First, Claimant argues that Dr. Fritz's finding that Claimant had "moderate" limitations in accepting instructions and handling criticism from supervisors required the ALJ to include a corresponding limitation in the RFC.[5] However, courts have repeatedly found that an RFC restriction to "occasional interaction with coworkers and supervisors" adequately mitigates moderate limitations in an ability to accept instructions and respond appropriately to criticism from supervisors. *See, e.g., LaValley v. Kijakazi*, No. 20-cv-1432-SCD, 2021 WL 5200238, at *7 n.5 (E.D.Wis. Nov. 8, 2021); *Trisha R. v. Saul*, No. 1:19-cv-443-JVB, 2021 WL 486926, at *2 (N.D.Ind. Feb. 10, 2021); *Jones v. Colvin*, No. 12 CV 50438, 2014 WL 467744, at *11 (N.D.Ill. Feb. 6, 2014) (finding that limiting Claimant to occasional contact with others was sufficient to account for his "explosive anger").

Despite this authority, Claimant argues that an "occasional contact" limitation cannot be sufficient because problems accepting instructions and criticism require a qualitative limitation in addition to a quantitative one. (Dckt. #17 at 8) ("A limitation to occasional interaction may limit the frequency of [Claimant's] interaction with supervisors and coworkers, but does not account for his potentially inappropriate reaction to the occasional instructions and criticism."). There are two fundamental problems with this argument. First, no medical opinion indicated that

---

[5] In his opening brief, Claimant mistakenly asserted that Dr. Fritz found him to have "marked" limitations in accepting instructions and handling criticism. (Dckt. #17 at 8). Claimant acknowledged this mistake in his reply. (Dckt. #23 at 7).

a qualitative limitation was necessary. *Dudley v. Berryhill*, 773 Fed.Appx. 838, 843 (7th Cir. 2019) ("When no doctor's opinion indicates greater limitations than those found by the ALJ, there is no error."). Second, the ALJ *did* impose a qualitative limitation by limiting Claimant to "work that involves no tandem job tasks requiring cooperation with others." (R. 18).

### 2. The RFC accounts for Dr. Fritz's finding that Claimant should relate with supervisors and coworkers "to the minimally necessary degree."

Claimant also cites Dr. Fritz's opinion that he should only relate with his supervisors and coworkers "to the minimally necessary degree," (R. 84), as inconsistent with the ALJ's finding that Claimant could manage "occasional interactions with co-workers and supervisors." (R. 18). In support of this argument Claimant incorrectly asserts that "occasional interaction" constitutes one third of the workday, whereas the "minimally necessary degree" depends on the specific position. (Dckt. #23 at 9). However, the DOT definition of "occasional" "does not refer to interactions with others; instead, it refers to the frequency with which an employee would have to exert various amounts of physical force." *Reynolds v. Kijakazi*, 25 F.4th 470, 474 (7th Cir. 2022). Accordingly, courts have repeatedly found that a state agency psychiatrist's opinion that a claimant should have "minimal" interactions with coworkers and supervisors is adequately encompassed by an RFC limiting the claimant to "occasional" interactions. *See, e.g., Teteak v. Kijakazi*, 20-cv-878-WMC, 2021 WL 3828831, at *7 (W.D.Wis. Aug. 27, 2021) (finding the ALJ "credited the state agency psychologists' opinion that Teteak should be limited to minimal interactions with others by crafting an RFC limiting him to 'occasional' interactions"); *Gauer v. Saul*, No. 18-C-515, 2019 WL 4599931, at *6 (E.D.Wis. Sept. 23, 2019); *Stamper v. Comm'r of Soc. Sec.*, No. 1:18 CV 697, 2019 WL 2437813, at *5 (N.D.Ohio May 8, 2019); *Jones*, 2014 WL 467744, at *11.

Even if the term "occasional" were less restrictive than "minimal," the distinction is irrelevant because the ALJ adequately explained how the evidence supports the limitation to "occasional" interactions. She noted that despite Claimant's reports of "frequent volatile situations, he: (1) does not isolate himself"; (2) enjoys going to the gym daily, where he "keeps to himself while working out so as not to embarrass his son"; (3) worked for approximately twenty-five years in sales "with extensive contact with customers both in person and over the phone"; (4) takes regular walks with his sister; (5) enjoys spending time with his family; and (6) reported "only one prior incident with a coworker," which was not violent. (R. 17). The ALJ also acknowledged the state agency psychiatrists' findings that Claimant could relate acceptably with supervisors and coworkers to the minimally acceptable degree and could "get along with coworkers or peers without distracting them or exhibiting behavioral extremes." Finally, the ALJ noted that Claimant was consistently cooperative during examinations and therapy sessions, is stable on medication, and "continues to be treated with medication and therapy." (R. 17, 23).[6]

Each of these facts supports the ALJ's finding that the RFC was sufficient to account for Claimant's symptoms. The ALJ's analysis of Claimant's social limitations was well-reasoned, well-supported by the evidence, and consistent with the findings of the state agency psychiatrists. The Court will not reweigh the evidence or substitute its judgment for the ALJ's. *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021).[7]

---

[6] While Claimant alleges that the ALJ did not address evidence regarding his "history of violence and confrontations with others," (Dckt. #17 at 8), a close reading of her decision shows that she cited every piece of evidence highlighted in Claimant's brief. Furthermore, the record does not support Claimant's assertion that he has a history of violence. While Claimant suggests the ALJ ignored evidence that he had "a physical confrontation" with the owner of his former company, (*Id.* at 8), the record shows that Claimant "*almost* got into a physical confrontation" with the owner, (R. 42) (emphasis added).

[7] Claimant similarly argues that the opinion of Dr. Banegas, his treating psychiatrist, required the ALJ to find more restrictive social limitations. However, the ALJ adequately supported her decision to give Dr.

## C. The ALJ did not error when weighing the opinion of Claimant's treating psychiatrist, Dr. Banegas.

Claimant next argues that the ALJ erred by improperly assigning little weight to the October 2016 opinion of his treating psychiatrist, Dr. Banegas. (R. 22). For the reasons stated below, however, the Court finds that the ALJ did not err when evaluating Dr. Banegas' opinion.

It is well-settled that "an ALJ need not blindly accept a treating physician's opinion." *Schreiber v. Colvin*, 519 Fed.Appx. 951, 958 (7th Cir. 2013). Instead, for claims filed prior to March 27, 2017, the treating physician rule requires an ALJ to give a treating physician's opinion regarding the nature and severity of a medical condition controlling weight only "if it is well-supported and not inconsistent with other substantial evidence." *Stage v. Colvin*, 812 F.3d 1121, 1126 (7th Cir. 2016); *Givens v. Colvin*, 551 Fed.Appx. 855, 861 (7th Cir. 2013) ("An ALJ may discount even a treating physician's opinion if it is inconsistent with the medical record."); *Luster v. Astrue*, 358 Fed.Appx. 738, 740 (7th Cir. 2010) ("an ALJ may reject a treating physician's opinion . . . if substantial evidence in the record contradicts the physician's findings."). When an ALJ rejects a treating source's opinion, "a sound explanation must be given for that decision," *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011), and courts will uphold "all but the most patently erroneous reasons for discounting a treating physician's assessment." *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015); *Luster*, 358 Fed.Appx. at 740. Moreover, "[o]nce well-supported contrary evidence is introduced, . . . a treating physician's opinion becomes just another piece of evidence for the ALJ to evaluate." *Karr*, 989 F.3d at 511.

Here, the ALJ provided several reasons for assigning "little" – rather than "controlling" – weight to Dr. Banegas' opinion. (R. 22-23). First, the ALJ questioned the foundation for the

---

Banegas' opinion "little weight," *see* Section IV(C), *infra*, and an ALJ is not required to incorporate limitations that she does not accept as credible. *Schmidt v. Astrue*, 496 F.3d 833, 846 (7th Cir. 2007).

opinion by noting that: (1) Dr. Banegas had not seen Claimant for six months at the time of the
2016 report – despite stating in her opinion that she was in contact with Claimant on a "monthly"
basis; and (2) her treatment records reflected only "sporadic appointments" with Claimant that
most often occurred when he was "experiencing certain job or family-related stressors." (R. 23).
The ALJ further noted that Dr. Banegas' finding that Claimant had "marked restrictions" in
interacting with the public and supervisors was not consistent with the entire record, particularly
the notes from the therapeutic program Claimant began in 2018 – over a year after Dr. Banegas
rendered her opinion in October 2016. (*Id.*). The ALJ cited conflicting evidence regarding
Claimant's functional abilities, namely that he: (1) interacts with the public daily, (R. 65); (2)
enjoys spending time at the gym and with his family, (R. 52, 65, 235); (3) benefits from
medication and therapy, (R. 311); and (4) had no hospitalizations during the period under review,
(R. 310). (R. 23). The ALJ also noted that Claimant reported being "stable" despite still
struggling with anger management during a May 2017 examination with Dr. Gonzalez, his new
primary care provider. (R. 311). The ALJ found that this evidence was inconsistent with the
severe social limitations described by Dr. Banegas and undercut her opinion. (R. 23).

　　　Claimant levels several criticisms at the ALJ's analysis. First, he asserts that the
"sporadic" nature of Dr. Banegas' treatment relationship with him was not a valid reason to
discount her opinion because the ALJ credited the opinion of other psychiatrists who never
examined Claimant. (Dckt. #23 at 10) ("The ALJ made a logical error by assign[ing] Dr.
Banegas' opinion little weight for seeing [Claimant] sporadically while assign[ing] the opinion
of non-examining State agency doctors' partial weight even though they never examined
[Claimant]."). This is not so. While it is true that "an ALJ generally affords 'more weight to the
opinion of a source who has examined' a claimant than to the opinion of a source who has not,

the weight ultimately given to that opinion depends on its consistency with and objective medical support in the record; the quality of the explanation the source gave for the opinion; and the source's specialization." *Givens,* 551 Fed.Appx. at 860. Here, the ALJ concluded that Dr. Banegas' opinion was entitled to little weight because "the overall record d[id] not support the substantial limitations found by [her]." (R. 23).

Second, Claimant contends that evidence of his improvement in 2017 and 2018 was also an invalid reason for discounting Dr. Banegas' findings because "many other opinions post-dating Dr. Banegas' October 2016 opinion detailed continued symptoms and limitations for [Claimant]." (Dckt. #23 at 11). Claimant primarily cites the records from his treatment at Riveredge hospital to support his assertion that he continued to present as anxious, depressed, easily agitated, and aggressive in the years following Dr. Banegas' report. Although these records show that Claimant's symptoms persisted, the records also show that his attitude was cooperative; his behavior was appropriate; his thought processes were coherent, goal-directed, and logical; his memory was intact; his judgment was fair to good; his attention span was good or "intact;" his impulse control was good; and his insight was good. (R. 375) (August 9, 2017 notes); (R. 342) (January 16, 2018 notes); (R. 341) (March 13, 2018 notes); (R. 340) (May 8, 2018 notes); (R. 339) (July 24, 2018 notes). As such, these records support the ALJ's finding that Claimant's limitations were not as severe Dr. Banegas found.

Third and contrary to Claimant's assertion, (Dckt. #23 at 11), the ALJ did not conflate Claimant's ability to perform activities of daily living with his ability to perform competitive work tasks. Instead, the ALJ properly considered Claimant's own reports regarding his activities of daily living when determining the weight to assign Dr. Banegas' opinion. *See, e.g., Schreiber v. Colvin*, 519 Fed.Appx. 951, 958 (7th Cir. 2013) (affirming ALJ's decision not to give

controlling weight to a treating physician's opinion where, *inter alia*, claimant's "own reported activities of daily living" were inconsistent with the treating physician's assessment of claimant's limitations).

Finally, Claimant asserts that the ALJ erred by not properly considering the factors specified in 20 C.F.R. §404.1527(c) after she decided to give Dr. Banegas' opinion less than controlling weight. (Dckt. #23 at 10). The Court disagrees. "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, the frequency of examination, the physician's specialty, the type of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. §404.1527(c)); *Karr*, 989 F.3d at 512. Here, the ALJ noted Dr. Banegas' status as Claimant's treating psychiatrist; discussed the "sporadic" nature of her treatment relationship with Claimant; discussed the type of test that Dr. Banegas performed;[8] and expressly discussed the consistency and supportability of Dr. Banegas' opinion. (R. 22-23). Thus, the ALJ properly evaluated Dr. Banegas' opinion within the applicable regulatory framework.

In sum: even if reasonable minds could differ as to the weight Dr. Banegas' opinion deserved, the Court is not at liberty to substitute its judgment for that of the ALJ by reweighing the evidence. *Karr*, 989 F.3d at 513; *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).

## D.    The ALJ appropriately evaluated Claimant's subjective complaints.

Finally, Claimant argues that the ALJ improperly discounted his subjective complaints as to the severity of his symptoms. More specifically, Claimant asserts that the ALJ improperly

---

[8] Specifically, the ALJ noted that Dr. Banegas found Claimant to have a global assessment of functioning (GAF) score of 41-50 on October 22, 2016. The ALJ properly treated the GAF score as opinion evidence, *see Lourdes C. v. Kijakazi*, No. 19-cv-4543, 2022 WL 595310, at *9 (N.D.Ill. Feb. 25, 2022), but gave the opinion little weight. (R. 23). Claimant does not challenge this finding.

mischaracterized evidence related to his driving abilities and failed to note that Claimant's work history weighed in favor of finding him credible.[9]  Because the ALJ is "in the best position to determine a witness's truthfulness and forthrightness . . . this court will not overturn an ALJ's credibility determination unless it is 'patently wrong.'"  *Skarbek v. Barnhart*, 390 F.3d 500, 504-05 (7th Cir.2004).  Because the ALJ's opinion on Claimant's credibility was well-reasoned and well-supported, reversal is unwarranted here.  *Elder*, 529 F.3d at 413.

### 1.    The ALJ did not mischaracterize Claimant's ability to drive.

The ALJ cited Claimant's ability to drive as evidence that he: (1) has no limitations in understanding, remembering, or applying information; (2) is capable of being around a lot of people; (3) has only mild limitations in concentrating, persisting, or maintaining pace; and (4) has only mild limitations in adapting or managing himself.  (R. 16-18).  According to Claimant, the ALJ "mischaracterized" his ability to drive because the record shows that his anxiety prevents him from driving more than five miles.  (*Id.* at 12).  However, the ALJ expressly acknowledged Claimant's reports that driving long distances was stressful and that he would sometimes ask family members to drive him places, (R. 18), and nonetheless found that:

> even *minimal* operation of a motor vehicle requires substantial attention and concentration, *in order to understand, remember, and carry out complex functions,* and to integrate such complex functions into independent situational awareness and projective judgment every few seconds.  It is certainly not a simple and routine set of functions.  Therefore, the claimant has no limitation in this area of functioning. Therefore, the claimant has no more than a mild limitation in concentrating, persisting, or maintaining pace.

(R. 16) (emphasis added in part).  The ALJ similarly cited Claimant's ability to drive himself as part of her discussion as to why Claimant has no more than a moderate limitation in interacting with others.  (R. 17).  She also acknowledged Claimant's self-reported limitations on his ability

---

[9] Claimant also argues that the ALJ's failure to "explain how . . . [Claimant] would not be confrontational at work" requires reversal.  This argument was adequately addressed in Section IV(B), *supra*.

to drive long distances when finding that he had no more than a mild limitation in his ability to adapt or manage himself. (R. 18). Claimant has failed to show that any of the findings and inferences that the ALJ made in reliance on his ability to drive are patently wrong.

> **2.    The ALJ properly considered Claimant's work history.**

Claimant argues that the ALJ erred by failing to consider his extensive work history and failing to explain why he "would stop working a lucrative job for disability benefits." (Dckt. #17 at 13). However, the ALJ expressly acknowledged that Claimant has a "work history of approximately [twenty-five] years in primarily sales with extensive contact with customers both in person and over the phone." (R. 22, 24). The ALJ also found – consistent with Claimant's position here – that Claimant lacks the RFC to perform his past work. (R. 24-25).[10] There was no error in the ALJ's consideration of Claimant's work history.

## CONCLUSION

For the foregoing reasons, Claimant's motion to reverse the final decision of the Commissioner of Social Security denying his claim for Disability Insurance Benefits, (Dckt. #17), is denied and the Commissioner's motion for summary judgment, (Dckt. #19), is granted. The decision of the ALJ is affirmed.

**ENTERED: August 9, 2022**

**Jeffrey I. Cummings**
**United States Magistrate Judge**

---

[10] Even if the ALJ had failed to consider Claimant's work history when assessing his subjective symptoms, that would not automatically warrant reversal. *See, e.g., Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017) (explaining that consistent work history weighs in favor of a "positive credibility finding," but is one of many factors and not dispositive); *Loveless*, 810 F.3d at 508 (concluding that ALJ's silence as to work history was "not enough to negate the substantial evidence supporting the adverse credibility finding").